# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF PENNSYLVANIA

**UNITED STATES OF AMERICA**     **:**     **3:CR-20-108**

          **v.**                **:**     **(JUDGE MANNION)**

**ROBERT THOMPSON,**          **:**

     **Defendant**           **:**

## M E M O R A N D U M

Presently before the court is the Motion to Suppress Wiretap Evidence, (Doc. 352), filed by defendant Robert Thompson, a/k/a "Jeffrey Parker", through his counsel. Thompson, who was charged in a second superseding indictment, (Doc. 392), with one count of conspiracy to distribute controlled substances, i.e., heroin, cocaine, fentanyl, cocaine base ("crack"), and tramadol, Count 1, in violation of 21 U.S.C. §841(a)(1), §841(b)(1)(A) and (B), and one count of distribution of a controlled substance, i.e., fentanyl, Count 10, in violation of 21 U.S.C. §841(a)(1) and §841(b)(1)(C), moved to suppress wiretap evidence.[1] Specifically, Thompson moved to suppress intercepted wire and electronic communications obtained from

---

[1]In Count 1, (Doc. 392 at 3), it is alleged that the amount of controlled substances involved in the drug trafficking conspiracy attributable to Thompson, is as follows:

> 1 kilogram and more of a mixture and substance containing a detectable amount of heroin; 400 grams and more of a mixture and substance containing a detectable amount of fentanyl; and 500 grams and more of a mixture and substance containing a detectable amount of cocaine.

co-defendant Tysheen Gott's Sprint wireless cellular telephones, and intercepted wire and electronic communications obtained from his, i.e., Thompson's, AT&T cellular telephone. Thompson claims that the government unlawfully intercepted the wire and electronic communications over the stated target cellular phones in violation of the Federal Wiretap Statute, Title 18, U.S.C. Section 2158, *et. seq*., and the Fourth Amendment, and that the evidence obtained from the wiretaps should all be suppressed.

The pending motion has been fully briefed and is now ripe for disposition. Based on the following, defendant Thompson's motion to suppress will be **DENIED IN ITS ENTIRETY** without the necessity of conducting an evidentiary hearing.

## I.    FACTUAL AND PROCEDURAL HISTORY[2]

Thompson has three remaining co-defendants in this case who are scheduled to jointly go to trial August 16, 2021, namely, Tysheen Gott, Anthony Brown and Damien Navarro. The drug investigation commencing in this case was initially focused on Gott, a/k/a "LB," and Navarro, and their joint drug activities,

_____

[2]Thompson's filings related to his instant motion do not contain the factual background of this case. The government's brief in opposition to Thompson's motion does contain the factual history of this case. (Doc. 411 at 1-4). Since Thompson does not dispute facts averred in the government's brief, the court relies upon the factual background in its brief for purposes of providing context to Thompson's motion. However, the facts stated herein are not findings made by the court.

possibly beginning in 2010 in the Wilkes-Barre, Luzerne County area and the Tunkhannock, Wyoming County area. During the course of this investigation, agents believed that Thompson was responsible for obtaining large quantities of heroin, fentanyl, cocaine and methamphetamine from various sources in the Wilkes-Barre area of Luzerne County, Pennsylvania, as well as New York and New Jersey, for redistribution. Agents then believed that Thompson distributed some of the drugs to several co-conspirators, including Tariek Mitchell and Juliette Grayson in Plymouth, Pennsylvania, who would then package bulk quantities of drugs and prepare the drugs for resale. Thompson would then allegedly distribute the drugs to Gott, Jean Almonor, Brown, and Amanda McPhillips. Agents believed that Brown and McPhillips would then sell some of the drugs throughout Lackawanna County and surrounding Counties as well as in Ohio and North Carolina. It was also believed that McPhillips couriered drugs to North Carolina and that Thompson had Brown package the bulk quantities of drugs for distribution in that state.

The investigation also revealed that Gott allegedly distributed the drugs to his subordinates, including Navarro, who in turn distributed them to lower level dealers, including Nicole Bozek and Susan Kimsel, throughout the Luzerne, Lackawanna, and Wyoming County areas.

Also as part of the investigation, James Rought, a/k/a "Fat Kid", was arrested and later convicted by a jury after a trial in this court in a separate case

for multiple counts of drug distribution resulting in death and serious bodily injury. *See* 18-CR-353, M.D. Pa. When Rought was arrested, he provided information to agents about "LB" (later discovered to be Gott) and indicated that "LB" was his source of fentanyl for several years. Rought also indicated that "LB" had been distributing several types of drugs for at least ten years and that "LB" had resided in Wilkes-Barre. The investigation then proceeded focusing on Gott after agents learned "LB" was his alias, and confidential informants were utilized who provided historical information to law enforcement regarding drug sales. Agents also used confidential informants for recorded conversations with targets, and for "controlled purchases" of drugs from targets under supervision by the government. Also, as part of the continuing investigation, the government obtained subpoenas of the subjects' phone records.

According to the government, (Doc. 411 at 3-4), the following occurred as a backdrop to the wiretaps that are the subject of Thompson's motion to suppress:

> On February 28, 2020, [allegedly] upon presentation of the fruits of the ongoing investigation, th[is] Court approved a thirty-day wiretap for electronic interception over "Gott Target Phone 1." [*See* 3:20-mc-159, Doc. 3, Filed Under Seal]. Interception of electronic communications over "Gott Target Phone 1" commenced on February 28, 2020 and was sealed on April 1, 2020. [That is, this court granted the government 30-days authorization to intercept wire and electronic communications regarding Sprint wireless cellular telephone (570) 235-0591 belonging to Gott.] [Also, Thompson, (Doc. 353 at 2), states that "[b]etween February 28, 2020, and April 17, 2020, text and audio communications were intercepted from Sprint wireless cellular telephones (Gott) some of which include communications in which Thompson is a party."]

On March 18, 2020, th[is] Court authorized a thirty-day wiretap for wire and electronic communications over "Gott Target Phone 2." (*See* Misc. No. 20-159-11 [3:20-mc-159, Doc. 11], Filed Under Seal). Interception of wire and electronic communications over "Gott Target Phone 2" commenced on March 18, 2020 and was sealed on April 22, 2020. [That is, this court granted the government 30-days authorization to intercept wire and electronic communications regarding Sprint wireless cellular telephone (570) 235-8250 belonging to Gott.]

On April 7, 2020, th[is] Court authorized a thirty-day wiretap for wire and electronic communications on a cellular device utilized by Robert Thompson and identified as "Thompson Target Phone 1." Interception of wire and electronic communications over "Thompson Target Phone 1" commenced on April 7, 2020 and was set to terminate on May 6, 2020. (*See* Misc. No. 20-159-23, [3:20-mc-159, Doc. 23], Filed Under Seal). On May 6, 2020, th[is] Court authorized a thirty-day extension to continue the interception of wire and electronic communications over "Thompson Target Phone 1," which was set to terminate on June 4, 2020. [That is, this court granted the government 30-days authorization to intercept wire and electronic communications regarding AT&T wireless cellular telephone (862) 867-9840 belonging to Thompson.][3]

Thompson contends that "[b]etween **March 28, 2020**, and June 5, 2020, text and audio communications were intercepted from AT&T wireless cellular telephone (862) 867-9840, (Thompson), some of which include communications in which Thompson is a party", and that "the Government began intercepting wire and electronic communications over AT&T wireless cellular telephone (862) 867-

---

[3]The court notes that Thompson concurs in his brief, (Doc. 353 at 2), with the above facts recited by the government regarding this court's authorizations for the wiretaps on his cell phone and Gott's cell phones. *See also* 3:20-mc-159.

9840, (Thompson), **before the existence of an authorizing Court Order**." (Doc. 353 at 3) (emphasis original).

Thompson thus contends that the wiretap of his cell phone began on March 28, 2020 despite the fact that this court did not issue the Order authorizing the interception of his cellular phone until April 7, 2020. For support, Thompson cites to the application for a search warrant submitted in this case, on June 1, 2020, and the Master Affidavit signed on May 29, 2020 by FBI Task Force Officer ("TFO") Shane Yelland which, on Paragraph 21, Page 19, stated:

> Interception of wire and electronic communications over THOMPSON's "Target Phone 1" **commenced on March 28, 2020**, and was set to terminate on May 6, 2020; however, on May 6, 2020, the Court granted a 30 day extension to continue the interception of wire and electronic communications over ROBERT THOMPSON's "Target Phone 1" set to terminate on June 4, 2020.

(Doc. 353 at 3) (emphasis added by defendant).

However, the government states that during the 30-day extension of the wiretap which this court granted on May 6, 2020 for Thompson's cell phone the following occurred:

> [O]n May 14, 2020, while monitoring "Thompson Target Phone 1," agents intercepted wire communications between Thompson and Jean Almonor involving Almonor making plans to acquire a large quantity of fentanyl. On May 15, 2020, pursuant to DOJ fentanyl protocol procedures, agents established surveillance of locations where Almonor was known to frequent, including the residence located at 71 Hutson Street in Wilkes-Barre [PA]. While surveilling Almonor, agents observed him as he exited 71 Hutson Street and met with an individual for the purpose of a drug sale. Almonor was arrested by Wilkes-Barre Police Officers and charged with possession with

6

intent to distribute controlled substances. At the time of his arrest, Almonor possessed two (2) bricks of heroin/fentanyl on his person, and another forty-five (45) bricks of heroin/fentanyl were seized from a bedroom shared by Almonor and Aisha Stephens at 71 Hutson Street. In response to Almonor's May 15, 2020 arrest, Thompson immediately discontinued his use of "Thompson Target Phone 1." On May 22, 2020, "Thompson Target Phone 1" was sealed by the Court.

Against the above stated backdrop, Thompson filed his motion to suppress and brief in support on April 11, 2021. (Docs. 352 & 353). After being granted an extension of time, the government filed its brief in opposition to the motion to suppress on May 24, 2021, with an attached Exhibit. (Docs. 411 & 411-1). On June 14, 2021, Thompson filed his reply brief. (Doc. 441).


## II.    LEGAL STANDARD FOR SUPPRESSION

The court has jurisdiction over Thompson's motion to suppress under 18 U.S.C. §3231. A criminal defendant brings a pre-trial motion to suppress evidence under Federal Rule of Criminal Procedure 12(b)(3)(C), in an effort "to show that evidence against him or her was unconstitutionally obtained." U.S. v. Hernandez, 2015 WL 5123924, at *4 (M.D. Pa. 2015).

Protection against unreasonable searches and seizures is enshrined in the Fourth Amendment, which states:

The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or

affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. amend. IV.

"The Fourth Amendment, like the other Amendments contained in the Bill of Rights, imposes direct limitations on the actions that may be taken by the Federal Government." Adams v. Springmeyer, 17 F.Supp.3d 478, 490 (W.D. Pa. 2014) (citing McDonald v. City of Chicago, 561 U.S. 742, 753–55 (2010)). The Fourth Amendment's purpose is to "safeguard the privacy and security of individuals against arbitrary invasions" by the government. Camara v. Mun. Ct. of S.F., 387 U.S. 523, 528 (1967). For purposes of the Fourth Amendment, a search "occurs when an expectation of privacy that society is prepared to consider as reasonable is infringed." United States v. Jacobsen, 466 U.S. 109, 113 (1984). In order to establish standing under the Fourth Amendment to challenge a search, a defendant must show a "reasonable expectation of privacy" in the place or thing searched. Rakas v. Illinois, 439 U.S. 128, 132 n.1 (1978).

"The traditional Fourth Amendment principles that apply to property searches govern probable cause determinations under the federal and/or state wiretap statutes. U.S. v. Tutis, 167 F.Supp.3d 683, 695 (D. N.J. March 8, 2016) (citing United States v. Tehfe, 722 F.2d 1114, 1118 (3d Cir. 1983); 18 U.S.C. §2518(3) (federal wiretap statute)). "Under these principles, a finding of probable cause requires a 'fair probability' of criminal activity, based upon the totality of the

circumstances." *Id*. (citations omitted). Thus, "the issuing court must 'make a practical, common-sense decision' concerning whether the circumstances set forth in the supporting affidavit, 'including the 'veracity' and 'basis of knowledge' of the persons supplying the hearsay information,' demonstrate 'a fair probability' that the authorization will result in evidence of a crime." *Id*. (citation omitted).

Further, the Supreme Court regards exclusion of evidence as an "extreme sanction" that "should be ordered only on a case-by-case basis and only in those unusual cases in which exclusion will further the purposes of the exclusionary rule," which center on deterring police misconduct. U.S. v. Leon, 468 U.S. 916, 918 (1984).

The Fourth Amendment also lays out four requirements of a valid search warrant. The warrant must: 1) be based on probable cause; 2) be supported by a sworn affidavit; 3) describe particularly the place of the search; and 4) describe particularly the persons or things to be seized. Groh v. Ramirez, 540 U.S. 551, 557 (2004).

"The Fourth Amendment requires that a search warrant be supported by probable cause, and '[e]vidence seized pursuant to a search warrant that is not so supported may be suppressed.'" U.S. v. Rivera, 524 Fed.Appx. 821, 825 (3d Cir. 2013) (citation omitted).

Generally, "the burden of proof is on the defendant who seeks to suppress evidence." U.S. v. Johnson, 63 F.3d 242, 245 (3d Cir. 1995) (citation omitted). "However, once the defendant has established a basis for his motion, [], the burden shifts to the government to show that the search or seizure was reasonable." *Id*. (citation omitted).

### III. DISCUSSION

In his motion to suppress, Thompson raises the following claims: (1) Thompson was not named as a subject in the wiretap application and order on either "Gott Target Phone 1" or "Gott Target Phone 2"; (2) all of the wiretap affidavits [i.e., the affidavits for "Gott Target Phone 1", "Gott Target Phone 2", and "Thompson Target Phone 1"] lacked sufficient probable cause statements; (3) the wiretap affidavits lacked sufficient necessity statements; and (4) the Government initiated interception of the "Thompson Target Phone 1" [on March 28, 2020] prior to the Court's authorization for that phone on April 7, 2020.

The court will address Thompson's claims in his motion *seriatim*.

### 1. Thompson Not Named in the Gott Target Phone 1 & 2 Applications

There is no dispute that Thompson was not named as a subject in either "Gott Target Phone 1" or "Gott Target Phone 2" applications for wiretap authorizations and, that between February 28, 2020 and April 17, 2020, text and

audio communications, including communications in which Thompson was a party, were intercepted from Gott's cellular telephones. As such, Thompson seeks to suppress any intercepted communications in which he was a party arguing that they are unlawful interceptions pursuant to 18 U.S.C. §2518(10)(a)(i).

Pursuant to 18 U.S.C. §2518(10)(a)(i), an "aggrieved person ... may move to suppress the contents of any wire or oral communication intercepted pursuant to this chapter, or evidence derived therefrom, on the grounds that the communication was unlawfully intercepted." "A communication is unlawfully intercepted if 'there is a failure to satisfy any of [the] statutory requirements that directly and substantially implement congressional intent to limit the use of intercept procedures to those situations clearly calling for the employment of this extraordinary investigative device." U.S. v. Romeu, 433 F.Supp.3d 631, 640 (M.D. Pa. 2020) (quoting United States v. Giordano, 416 U.S. 505, 527, 94 S.Ct. 1820 (1974)).

It is of no moment that Thompson was not named as a subject in the applications or authorizations for the "Gott Target Phone 1" and "Gott Target Phone 2" wiretaps. The relevant statute, 18 U.S.C. §2518(1)(b)(iv), requires "[e]ach application for an order authorizing ... the interception of a wire, oral, or electronic communication" to include "the identity of the person, *if known*,

committing the offense and whose communications are to be intercepted."

(emphasis added).

As the Supreme Court in <u>United States v. Kahn</u>, 415 U.S. 143, 151-152, 94

S. Ct. 977, 982, explained:

> [the statute] would plainly seem to require the naming of a specific person in the wiretap application only when law enforcement officials believe that such an individual is actually committing one of the offenses specified in 18 U.S.C. §2516. Since it is undisputed here that [the defendant, unnamed in the application for a wiretap authorization,] was not known to the Government to be engaging in [the relevant illegal] activities at the time the interception order was sought, the failure to include her name in the application would thus seem to comport with the literal language of §2518(1)(b)(iv).

In <u>United States v. Donovan</u>, 429 U.S. 413, 435, 97 S.Ct. 658, 672 (1977),

the Supreme Court elaborated by stating:

> [i]f, after evaluating the statutorily enumerated factors in light of the information contained in the application, the judge concludes that the wiretap order should issue, the failure to identify additional persons who are likely to be overheard engaging in incriminating conversations could hardly invalidate an otherwise lawful judicial authorization. The intercept order may issue only if the issuing judge determines that the statutory factors are present, and the failure to name additional targets in no way detracts from the sufficiency of those factors.

The court in <u>U.S. v. Stevenson</u>, 2013 WL 12205623, *3 (M.D. Pa. Oct. 25,

2013), considered a claim very similar to Thompson's first claim in this case and

rejected it by stating:

> The same analysis [as in <u>Donovan</u>] applies here: because [defendant's] involvement in the organization was unknown at the time the Government applied for the [first and second Gott] wiretap[s], its failure to include him does not violate the statute. Indeed, in <u>Donovan</u>, the Supreme Court

12

overturned a suppression order that was based on very similar arguments to those that [Thompson] brings. *See id*. at 419-22. There, "[d]uring the course of the wiretap, the Government learned that respondents Donovan, Robbins, and Buzzacco were discussing illegal gambling activities with the named subjects." *Id.* at 419. Nonetheless, the Supreme Court held that the facts that the respondents were not named in the initial application—or even in a subsequent application after their illegal activities were uncovered—did not warrant suppression of evidence gathered against them. *See id*. at 419-22.

Thus, the court will deny Thompson's suppression motion with respect to his intercepted communications with Gott insofar as it is based on the government's failure to name him as a subject in the applications and authorizations for the "Gott Target Phone 1" and "Gott Target Phone 2" wiretaps since "Thompson's involvement in the organization was unknown at the time the Government applied for [these] wiretaps." (Doc. 411 at 6). *See id*.

## 2. The Government's Wiretap Affidavits Submitted in Support of Wiretap Authorizations Established Sufficient Probable Cause

Next, Thompson argues that the affidavits for the wiretap authorizations for "Gott Target Phone 1", "Gott Target Phone 2", and for his cell phone fail to establish sufficient probable cause for the wiretaps. He contends that "the [government's] requests for authorization for interception of communications were deficient and that the Court erred in granting the orders authorizing the interceptions." (Doc. 353, at 7). He also contends that "probable cause did not exist to justify the District Court's initial grant of authorization to intercept the wireless communications in this case." (Doc. 353 at 10).

13

Pursuant to 18 U.S.C. §2518(3), the court must determine, prior to issuing an order authorizing the interception of wire, oral, or electronic communications (i.e., a Title III wiretap), that the application establishes:

(a) there is probable cause for belief that an individual is committing, has committed, or is about to commit a particular offense enumerated in section 2516 of this chapter;

(b) there is probable cause for belief that particular communications concerning that offense will be obtained through such interception;

(c) normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous;

(d) ... there is probable cause for belief that the facilities from which, or the place where, the wire, oral, or electronic communications are to be intercepted are being used, or are about to be used, in connection with the commission of such offense, or are leased to, listed in the name of, or commonly used by such person.

"If any of the §2518(3) requirements are not met by the wiretap application, then the authorization and any surveillance pursuant to it were improper." U.S. v. Romeu, 433 F.Supp.3d 631, 640 (M.D. Pa. 2020) (internal quotations and citation omitted). "Additionally, if the surveillance is improper, then the interception is unlawful pursuant to 18 U.S.C. §2518(10)(a)(i), and the government could not use the fruits of that surveillance at trial or to further its investigation." *Id*. (internal quotations and citation omitted).

Thus, "Title III requires an applicant to show probable cause in three different contexts." *Id*. "[T]he first is that an individual has or is about to commit one of

14

several enumerated offenses ...; the second[,] that particular communications relating to the charged offense will be obtained through the interception; and third[,] that the premises where the interception will be made are being used in connection with the charged offense." *Id*. at 640-41 (citation omitted).

As mentioned, the same 4th Amendment principles applicable to a warrant for a physical search apply to an authorization for a wiretap. *See* United States v. Tehfe, 722 F.2d 1114, 1118 (3d Cir. 1983); Tutis, 167 F.Supp.3d at 695. Since these 4th Amendment principles are stated above, they shall not be repeated. Suffice to say that "the Third Circuit has held that courts must apply a commonsense approach, based on the totality of the circumstances, to determine whether there was probable cause." Romeu, 433 F.Supp.3d at 641 (internal quotations and citation omitted). *See also* Tutis, 167 F.Supp.3d at 695 (holding that "the issuing court must make a practical, common-sense decision concerning whether the circumstances set forth in the supporting affidavit, including the veracity and basis of knowledge of the persons supplying the hearsay information, demonstrate a fair probability that the authorization will result in evidence of a crime." (internal quotations and citation omitted).

Thompson argues that the affidavits in support of the wiretap applications fail to set forth sufficient detail and reliable facts tending to establish that the individuals named committed or were committing the offenses alleged therein. He

further contends that "the applications failed to establish probable cause that the particular communications facilities are being used in connection with the proffered offenses, and/or that there was probable cause to believe that particular communications concerning a proffered offense would be obtained through the interception, or continued interception, of the wire communication." (Doc. 353 at 12).

The court has reviewed that affidavit of TFO Yelland regarding the wiretap application for "Gott Target Phone 1." (*See* Misc. No. 20-159, Docs. 2 through 2-5, Filed Under Seal). Since the lengthy 131-page "Gott Target Phone 1" affidavit of Yelland is accurately summarized by the government, (Doc. 411 at 8-14), and since Thompson does not dispute this summary, the court does not repeat it herein.

In short, as the government explains, (*id*. at 13-14), in its brief:

> The volume of communications over "Gott Target Phone 1" ascertained using toll records and pen registers during the early stages of the investigation, as detailed in the initial affidavit, [Doc. 2], revealed that Gott's cell phones, including "Gott Target Phone 1," communicated with other communication devices thousands of times during the period covered by toll records and pen registers. Many communications, including text message communications, that occurred over Gott's cell phones, including "Gott Target Phone 1," occurred to and from phones with New York area codes that had no subscriber information indicated. Agents relied upon their experience to infer that drug traffickers frequently use telephones that are not subscribed to anyone so as to thwart the ability of law enforcement officials to identify who is involved in the drug trafficking. The same is detailed in the initial affidavit. Id. at 98-99. It was also detailed that during a conversation with CW#1 on May 14, 2019, Gott indicated that his "New York

boys" were not around, which was interpreted to mean that Gott's normal supplier of drugs came from New York to deliver the drugs to Gott. Agents reasonably inferred that, based upon the totality of the circumstances, there was probable cause to believe that Gott's drug suppliers would be identified through the interception of electronic communications occurring over "Gott Target Phone 1."

Significantly, as the government states, (Id. at 14), "Gott's drug supplier was identified as the defendant, Robert Thompson, during wire and electronic interceptions authorized by the March 18, 2020 Court Order for 'Gott Target Phone 2.'"

The court finds that the affidavit for "Gott Target Phone 1" on its face provided more than ample facts to establish probable cause based on the three requirements under 18 U.S.C. §2518(3). *See* Tutis, 167 F.Supp.3d at 696 ("the probable cause determination of an issuing court will be upheld so long as the supporting documents provided a substantial basis for the initial probable cause decision", and "slight doubts concerning the propriety of the wiretap authorization [should] be resolved in favor of the issuing court."). Thus, Thompson's motion to suppress regarding the alleged insufficiency of the initial affidavit for "Gott Target Phone 1" will be denied.

The court now considers the sufficiency of probable cause with respect to the 164-page affidavit of TFO Yelland for the wiretap application submitted in support of the authorization for "Gott Target Phone 2." (*See* Misc. No. 20-159, Docs. 10 through 10-7, Filed Under Seal).

17

The government states that it applied for the application seeking authorization to intercept wire and electronic communications with respect to "Gott Target Phone 2" since "[i]t became apparent to agents early on in the monitoring process that Gott was utilizing a new cellular device, which was consistent with information provided by several of Gott's customers to agents, i.e., Gott would frequently change his cellular telephone number." (Doc. 411 at 14). In particular, the government states that "[b]y March 1, 2020, it became clear to agents that Gott was utilizing a different cellular device and [agents] detailed [this] in the affidavit."

The government provides specific summaries from the affidavit regarding the authorization for "Gott Target Phone 2" in its brief, (Doc. 411 at 15-18), and explains the basis for agents to believe that "Gott's drug customers were looking to purchase controlled substances from Gott", and how "agents were able to confirm [on March 5, 2020] that Gott was utilizing a different cellular device from which to conduct drug transactions." In fact, in a intercepted text message from "Gott Target Phone 1", a person identified as "U/P", who was believed to have a close personal relationship with Gott, asked Gott to provide her with his new telephone number. The government also recounts how agents conducted video surveillance of Gott's house located at 71 Parrish Street, Wilkes-Barre, PA, and recorded Gott engaging in a drug transaction on March 4, 2020, and how agents conducted "controlled purchases" of drugs from Gott through confidential

informants, including CW#1. These drug transactions in which Gott was directly involved were detailed in the affidavit. (*See* Misc. No. 20-159, Filed Under Seal, Doc. 10-5 at 109-117).

The affidavit also states that on March 5, 2020, an Administrative Subpoena was issued to Sprint requesting toll records for Gott's "Target Phone 2", but that the toll records resulted in only two days of data (March 3-4, 2020) to compare for Gott's "Target Phone 2." TFO Yelland stated in the affidavit that he "reviewed the limited toll records (March 3, 2020 – March 4, 2020) for "Target Phone 2" and compared the toll records against the pen register/trap and trace data and toll records of "Gott Target Phone 1", and that "[he] discovered that of the 20 telephone numbers in contact with "Gott Target Phone 2" 16 of the telephone numbers were previously in contact with "Target Phone 1." He also stated that "[o]f the 20 telephone numbers listed in the toll records for "Target Phone 2" only 2 of the telephone numbers were not in contact with any of TYSHEEN GOTT's prior cellular facilities." (*See* Misc. No. 20-159, Filed Under Seal, Doc. 10-6 at 123-124).

Further as the government points out, (Doc. 411 at 21-22), in its brief:

[I]n the affidavit supporting authorization to intercept wire and electronic communications over "Gott Target Phone 2" was the articulation of the goal to identify the persons who were supplying controlled substances to Gott. The toll records and pen register results for many of Gott's prior phones, including "Gott Target Phone 1" and "Gott Target Phone 2," revealed that these telephones were communicating with other communication devices during the period covered by the toll records and pen registers. Many communications, including text messages that occurred to and from Gott's

phones, occurred with phones that had New York area codes with no subscriber information indicated. Again, agents reasonably relied on their training and experience to infer that drug traffickers frequently use telephones that are not subscribed to anyone so as to thwart the ability of law enforcement officials to identify who is involved in the drug trafficking. It was further noted previously in the affidavit, during a conversation with CW#1 on May 14, 2019, that Gott indicated his "New York boys" were not around, which was reasonably interpreted to mean that Gott's normal supplier of drugs came from New York to deliver the drugs to Gott.

The court finds that TFO Yelland reasonably concluded that intercepting communications from "Gott Target Phone 2" would reveal conversations concerning the drug trafficking activities in which Gott, along with others, were involved, and which clearly satisfied the requirements under 18 U.S.C. §2518(3)(b) and (d), by detailing a substantial basis for his belief that "Gott Target Phone 2" was being used to commit the specified drug offenses. As such, Thompson's motion to suppress based on his claim that the affidavit for authorization regarding "Gott Target Phone 2" failed to provide sufficient probable cause will be denied.

Thompson also seeks to suppress the intercepted communications obtained from "Thompson Target Phone 1" by arguing that the affidavit in support of the application for authorization for this wiretap did not provide sufficient probable cause.

As indicated, the agents obtained a wiretap to intercept wire and electronic communications over "Gott Target Phone 2", in part, to obtain information about Gott's drug suppliers. The government states that "Robert Thompson, a/k/a

"Jeffrey Parker" was first identified as Gott's supplier on March 26, 2020", and that "[s]ubsequent communications led to the Court's April 7, 2020 Order authorizing wire and electronic communication over "Thompson Target Phone 1 [an AT&T cellular prepaid phone with number (862)867-9840]." (Doc. 411 at 22) (citing Misc. No. 20-159, Doc. 22, Filed Under Seal). The government, (*id*. at 23), then explains that "[Thompson] was first intercepted on March 24, 2020 via monitoring of wire and electronic communications over "Gott Target Phone 2", and that "[t]he affidavit in support of the requested authorization to monitor "Thompson Target Phone 1" details the identification of Robert Thompson, [Misc. No. 20-159, Filed Under Seal Doc. 22-3 at 91], as well as the drug related communications between Gott and Thompson." [Id. at 92-95]. Gott also indicated to Thompson that his drug sales were slow due to the COVID-19 pandemic, stating "Shit mad slow". Thus, it states that "[t]o the trained agents, it was apparent that Gott and Thompson were communicating about drug transactions and that Thompson was supplying Gott with controlled substances for distribution." (Id.).

The government details various communications between Gott and Thompson from which agents could reasonably infer that " Thompson was advising Gott that whenever he was ready for controlled substances, Thompson could supply him." (*See* Doc. 411 at 23-26). Since the affidavit is filed in this case as Misc. No. 20-159, Docs. 22 through 22-5, the court does not detail the voluminous

averments made in the affidavit of probable cause for authorization to intercept wire and electronic communications regarding "Thompson Target Phone 1." The court does note that the affidavit also describes how, on March 26, 2020, agents intercepted an incoming telephone call Gott received on "Gott Target Phone 2" from Thompson at telephone number (862)867-9840 to set up a drug sale, and how agents then conducted surveillance at the location in Wilkes-Barre where the men agreed to later meet for the sale. Agents then observed and photographed Thompson meeting with Gott in his car for purposes of what they reasonably believed to be a drug transaction. (*See* Misc. No. 20-159, Filed Under Seal, Doc. 22-3 at 95-103).

Thus, as the government, (Doc. 411 at 27), concludes:

[The] information contained in the affidavit in support of wire and electronic interception over "Thompson Target Phone 1" provides more than ample probable cause to believe that Gott was utilizing "Gott Target Phone 2" to communicate with Robert Thompson, either as a source of supply or a courier for a source of supply. In order to determine Thompson's role in the conspiracy and potentially lead to the identity of others higher up in the conspiracy, agents provided the Court with ample probable cause in support of the Court's April 7, 2020 Order authorization the interception over "Thompson Target Phone 1."

Thus, the court finds there was more than an abundance of probable cause with respect to the affidavit for the wiretap application in support of the court's April 7, 2020 authorization for "Thompson Target Phone 1", and Thompson's motion to suppress will be denied regarding this claim.

Next, the court considers whether the May 6, 2020 affidavit in support for authorization for the continued wire and electronic communications regarding "Thompson Target Phone 1" was supported by sufficient probable cause. The court authorized the continued interception of "Thompson Target Phone 1" on May 6, 2020, and found that there was more than ample probable cause. (*See* Misc. No. 20-159, Docs. 34 through 34-4, Filed Under Seal).

Upon review of the affidavit for continued interception of "Thompson Target Phone 1", the court again finds that there was more than sufficient probable cause for the court's authorization. As the government points out, (Doc. 411 at 28), "while monitoring "Thompson Target Phone 1," agents intercepted calls between Thompson and his drug subordinates, as detailed in the affidavit", and that "[this] initial monitoring of "Thompson Target Phone 1" led to the identification of Jean Almonor, Juliette Grayson and Tariek Mitchell." Also, the affidavit described that "agents learned that Tariek Mitchell was an individual paid by Thompson to package bulk heroin/fentanyl into glassine bags, bundles, bricks and ultimately into boxes containing approximately 12 bricks (600 bags) of heroin/fentanyl." (*See* Misc. No. 20-159, Filed Under Seal, Docs. 34 & 34-1 at 23–29). Further, the affidavit indicated that "Agents learned that Juliette Grayson was supplied quantities of heroin/fentanyl by Thompson and sold those drugs to her customers", and learned the Jean Almonor, a/k/a "Hollywood" was a subordinate for

23

Thompson." (Id. at 23-36). Since the specific instances of intercepted communications Thompson had with Almonor are stated in the affidavit, they are not repeated herein. (*See* Misc. No. 20-159, Filed Under Seal, Doc. 34-1 at 35-38).

Thus, it was apparent from the affidavit in support of the continued wiretap for "Thompson Target Phone 1" that there was overwhelming probable cause to believe that the continuation would allow agents to identify Thompson's subordinates and to discover the scope of his drug trafficking network. The wiretap on "Thompson Target Phone 1" revealed voluminous and informative information about numerous drug transactions and about the extent of the operation. In fact, the affidavit detailed numerous drug communications based on the initial wiretap for "Thompson Target Phone 1" between Thompson and others involved in this network, including Almonor, Mitchell, Gott, and Grayson. (*See* Misc. No. 20-159, Filed Under Seal, Docs. 34-1 & 34-2 at 40-70). Further, as the government states, (Doc. 411 at 31), "the continued interception of "Thompson Target Phone 1" led to the identification of additional drug trafficking subordinates of Thompson, including Anthony Brown, a/k/a "BX" and Amanda McPhillips, as well as their role in the conspiracy and their primary area of drug distribution."

The court finds that TFO Yelland's affidavit, viewed in its entirety, demonstrated more than a fair probability of Thompson's significant involvement

in criminal drug trafficking activity utilizing "Thompson Target Phone 1." Thus, the court finds that the affidavit in support of the continued interception of wire and electronic communication over "Thompson Target Phone 1" had more than sufficient probable cause to support the court's May 6, 2020 Order authorizing this continued wiretap, and Thompson's motion will be denied regarding his claim that the affidavit lacked probable cause.

### 3. The Government's Wiretap Affidavits Submitted in Support of the Title III Intercepts Sufficiently Established the "Necessity" Requirement of 18 U.S.C. §2518

As this third claim, Thompson argues that the affidavits supporting the wiretap applications with respect to "Gott Target Phone #1", "Gott Target Phone #2", and "Thompson Target Phone #1" fail to satisfy the necessity requirement of 18 U.S.C. §2518.

The so-called "necessity" requirement provides that "[a]n application for an intercept authorization must include a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous." U.S. v. Ellis, 693 Fed.Appx. 137, 139 (3d Cir. 2017) (citing 18 U.S.C. §2518(1)(c)).

In Ellis, id., the Third Circuit explained the requirement that the application for a wiretap must contain a statement of necessity and the court's role in making its determination of necessity as follows:

25

The applicable investigative procedures generally include, *inter alia*, (1) visual and aural surveillance, (2) general questioning or interrogation under immunity grants, (3) regular search warrants, and (4) the infiltration of conspiratorial groups by undercover agents or informants. United States v. Armocida, 515 F.2d 29, 37 (3rd Cir. 1975). They may also include using a pen register or trap-and-trace device. United States v. Killingsworth, 117 F.3d 1159, 1163 (10th Cir. 1997). The application does not have to show these other techniques could not possibly succeed. Armocida, 515 F.2d at 37. Rather, the application must describe the facts and circumstances surrounding the investigation that establish a "factual predicate" sufficient to allow the issuing court to determine such techniques will likely be unsuccessful or too dangerous. United States v. McGlory, 968 F.2d 309, 345 (3rd Cir. 1992). Section 2518(3)(c) "is simply designed to assure that wiretapping is not resorted to in situations where traditional investigative techniques would suffice to expose the crime." United States v. Kahn, 415 U.S. 143, 153 n.12, 94 S.Ct. 977, 39 L.Ed.2d 225 (1974). An application should "be tested in a practical and commonsense fashion," and "the statutory burden on the government is not great." Armocida, 515 F.2d at 38. "[I]n determining whether this requirement has been satisfied, a court may properly take into account affirmations which are founded in part upon the experience of specially trained agents." United States v. Williams, 124 F.3d 411, 418 (3rd Cir. 1997) (quotation mark omitted).

Moreover, in cases like the instant case which involve a wide-ranging drug trafficking conspiracy and the distribution of drugs, such as heroin and fentanyl, the Third Circuit has indicated that Title III wiretaps are often sought to aid investigations into large scale conspiracies. *See* United States v. Heilman, 377 Fed.Appx. 157, 174 (3d Cir. 2010); Vento, 533 F.2d at 850 (holding that "[i]n the proper circumstances, the instrumentalities of Title III may be employed to discover the full extent of crimes and conspiracies."); Armocida, 515 F.2d at 35. As the government indicates, "[u]nlike other crimes which 'come[ ]to an end upon the capture of the criminal,' conspiracies present 'special dangers' that provide the

26

Government with 'more leeway in its investigative methods.'" (Doc. 411 at 33) (citing United States v. Kaboni Savage, 2013 WL 1334169 (E.D. Pa.); Armocida, 515 F.2d at 38 (upholding the district court's necessity finding, and observing that "[a]lthough the Government has actual knowledge of a conspiracy and evidence sufficient to prosecute one of the conspirators, it is unrealistic to require termination of an investigation before the entire scope of the narcotics distribution network is uncovered and the identity of its participants learned")).

In fact, in Ellis, 693 Fed.Appx. at 139, the Third Circuit stated that "[the] clear import [of its cases] shows that, at least where the government investigation targets a large conspiracy and the individuals whose communications will be intercepted are members of that conspiracy, the necessity requirement relates to the demonstrated or probable inadequacy or danger of other investigative techniques to achieve the specific goals pursued by the investigation at hand." (citing United States v. Bailey, 840 F.3d 99, 114-16 (3rd Cir. 2016) ("Law enforcement further determined that other, less invasive investigative techniques would also fail to reveal the full scope of the [conspiracy's] operations." "In the proper circumstances, the instrumentalities of Title III may be employed to discover the full extent of crimes and conspiracies."); Williams, 124 F.3d at 418 (stating 18 U.S.C. §2518(3)(c) is satisfied by showing, among other things, "the difficulty of

penetrating an organization with a secretive nature and a propensity towards violence")).

Similar to <u>Bailey</u> and <u>Ellis</u>, *id*., "[a]ll [of the] applications in this case arose from an investigation of a large drug-trafficking conspiracy in [northeast Pennsylvania and beyond]."

In this case, each of the applications had affidavits in support of the wiretaps that included detailed statements of necessity, all which included in exhaustive detail the goals of the investigation, i.e., "discovering the full scope and identification of key personnel involved in illegal drug trafficking on behalf of Robert Thompson, Tysheen Gott, and their criminal enterprise" and "obtaining admissible evidence which demonstrates beyond a reasonable doubt that Robert Thompson, Tysheen Gott, and the other target subjects and any later identified targets, committed the alleged [drug trafficking offenses]", as well as a lengthy description of "the investigative techniques that were used and/or considered for use, or failed to accomplish the goals and objectives of the investigation." (Doc. 411 at 35-36). Since these sections of the affidavits are filed in this case, s*ee* Misc. No. 20-159, and are detailed at length in the government's brief, (Doc. 411 at 35-41), they are not repeated herein. Suffice to say that "the Application[s] could (and did) satisfy §2518(1)(c) by showing other investigative techniques, even if used against [Thompson], were or would likely be unable to achieve the goals of the overarching

investigation to which the Application[s] relate[]", Ellis, 693 Fed.Appx. at 140, such as by averring "the intercepted communications and observations of Thompson['s] activities, lead your affiant to believe Thompson is either Gott's, Almonor's, Mitchell['s] and Grayson's source of supply, or the courier for the source of supply." (Doc. 411 at 37). As in Ellis, id., "[t]he Application[s] explicitly base[] [their] assertions on information obtained from law enforcement involved in the investigation and interpreted in light of the training and experience of [TFO Yelland]", and "[t]his is precisely the type of information on which [the Third Circuit] cases allow the issuing court to rely." (citing United States v. Williams, 124 F.3d 411, 418 (3rd Cir. 1997)). *See also* Bailey, 840 F.3d at 114-16.

As the government states, (Doc. 411 at 41), "[a] review of the extensive affidavits demonstrates that although several other traditional investigative techniques yielded significant sources of information, the use of a wiretap was necessary to accomplish the goals of the investigation, some of which included the identification of all of the confederates involved in this drug trafficking conspiracy, and the identification of the suppliers, customers and storage locations for this drug trafficking organization." Thompson's conclusory and speculative contentions that the applications failed to specify factual predicates showing other investigative techniques were or would likely be unsuccessful if used in relation to him are not sufficient in light of the lengthy details in the affidavits explaining how the normal

investigative techniques had been tried, had failed, and/or were deemed too unlikely or too dangerous to accomplish the legitimate goals of the wide-spread drug trafficking investigation. *See* Ellis, *supra*.

As such, the court finds that all of the government's applications for wiretaps in this case "contained a sufficient factual predicate to allow the issuing court to conclude other investigative techniques, even if used in relation to [Thompson], had not and likely would not uncover the full scope of the conspiracy." Ellis, 693 Fed.Appx. at 141 (citing United States v. Phillips, 959 F.2d 1187, 1190 (3rd Cir. 1992)).

Thus, the court will deny Thompson's motion to suppress communications to and from "Gott Target Phone #1", "Gott Target Phone #2", and "Thompson Target Phone #1" intercepted pursuant to the authorizations since the affidavits in support of the applications met the "necessity" requirement of 18 U.S.C. §2518.

### 4. The Government Did Not Initiate Interception of "Thompson Target Phone 1" Prior to Court Authorization

Finally, Thompson argues that the government began intercepting his communications on his AT&T cell phone before the court's authorization for them. Thompson argues that the government began unlawfully intercepting wire and electronic communications over "Thompson Target Phone 1" for a 10-day period commencing on March 28, 2020, before the court's Order dated April 7, 2020, in violation of the Federal Wiretap Statute. (Doc. 352, ¶s 17-18). In support of his

contention, Thompson refers to paragraph 21 on page 19 of the Master Affidavit of TFO Yelland indicating that interception of "Thompson Target Phone 1" commenced on "March 28, 2020." The government recognizes the discrepancy and states that this was "an obvious typographical error" contained in the search warrant affidavit and that the interception of "Thompson Target Phone 1" on March 28, 2020, "would have been a physical impossibility." (Doc. 411 at 42).

The court has examined the record in this case and finds that that paragraph 21 of the Master Affidavit contains a typographical error regarding the initiation of the interception of the communications regarding "Thompson Target Phone 1" on "March 28, 2020."

First, the government, (Doc. 411 at 42-43), explains the wiretap process used:

> a cellular service provider cannot lawfully permit interception of wire and electronic communications without the Court's Order. Thompson is in possession of the Court's Order and is aware that it was not authorized until April 7, 2020. [*See* 20-mc-159, Doc. 23] The Court's Order only begins the process. That Order must be relayed to an FBI technical squad who is then tasked with interfacing with the cellular service provider, AT&T in this case, by first providing the Court's Order to the particular cellular service provider, and then technically facilitating the electronic ability to intercept and store the communications. Likewise, the particular cellular service provider, AT&T in this case, cannot lawfully assist in that process without first receiving the Court's Order, and then technically facilitating the electronic ability to begin interception pursuant to the Court's Orde[r].

Thus, the government contends that "Thompson's argument that the FBI intercepted wire and electronic communications over "Thompson Target Phone 1"

31

prior to the Court's April 7, 2020 Order is premised on a physical and legal impossibility", and that "[i]t would also have to be premised on AT&T being a willing accomplice of Government agents, i.e., permitting interception [of Thompson's cell phone] without a lawful court order." There is simply no evidence of any agreement between the agents and AT&T to unlawfully begin the wiretap on Thompson's cell phone before the court issued the Order authorizing it.

Even more compelling is the fact that the record shows that the reference to the March 28, 2020 date was "an obvious typographical error" since "the preceding sentence of paragraph 21 on page 19 of the search warrant affidavit correctly states that on April 7, 2020, the Court signed an Order authorizing the interception of wire and electronic communications on a cellular device utilized by Robert Thompson, a/k/a "Jeffrey Parker, for a thirty-day period." (Id. at 43) (citing Master Affidavit, 3:20-MC-312, Filed Under Seal, ¶21). Also, paragraph 21 of the search warrant affidavit states that interception over "Thompson Target Phone 1" would terminate on May 6, 2020, which was the expiration of the 30-day period (obviously commencing on April 7, 2020) authorized by the Court. (*See also* Doc. 411-1, a photograph of the FBI whiteboard kept in the wire interception room showing how agents tracked the wiretap interception commencement and termination dates regarding all of the affidavits in this case, including "Thompson TP 1", which was depicted on the board as starting on "4/7".).

As further proof demonstrated by the record to show that Thompson's claim lacks any merit, the government details the dates regarding when the actual interception of Thompson's cell phone occurred as well as the evidence collected from these interceptions, and explains:

> [T]here are no communications, wire or electronic, that are detailed in either the affidavit in support of continued interception over "Thompson Target Phone 1," or in the search warrant affidavit, that begin prior to April 7, 2020. Thompson does not note any such communications in support of his claim. Likewise, the entirety of the wiretap evidence has been provided to all defendants and there are no intercepted communications over "Thompson Target Phone 1" that occurred prior to April 7, 2020. The first reference to any communication intercepted over "Thompson Target Phone 1" in the affidavit in support of continued interception begins on April 8, 2020 when Thompson sends a text message to Tariek Mitchell. (*See* Misc. No. 20-159, Filed Under Seal, Doc. 34 at 24). The first reference to any communication intercepted over "Thompson Target Phone 1" in the search warrant affidavit begins on April 8, 2020, when text messages are exchanged between Thompson and Gott, and Thompson and Brown. (Master Affidavit, 3:20-MC-313, Filed Under Seal, at 40, 42).

In his reply brief, (Doc. 441 at 3), for support in the record regarding his claim that "for a period of 10 days [from March 28, 2020 through April 7, 2020], the government was unlawfully intercepting wire and electronic communications over ["Thompson Target Phone 1"] in violation of the Federal Wiretap Statute and the Fourth Amendment", Thompson cites to pages 50 and 55 of Yelland's Master Affidavit, 3:20-MC-313. Paragraph 30, page 50, of the Master Affidavit has a section entitled "Pertinent Conversations Captured on Thompson's 'Target Phone

1' between Thompson and Amanda McPhillips." On page 55 of the Master Affidavit, it states, in part, as follows:

> On April 4, 2020, a cooperating witness, hereafter referred to as CW#2, was interviewed regarding his/her knowledge of Anthony Brown. CW#2 has previously provided accurate and credible information that was used to secure a search warrant in an unrelated investigation. **To date**, CW#2's information has proven accurate and has been corroborated, where possible, in the following manner: (a) through record checks, including PABMV checks; (b) through surveillance; and (c) **through wire and electronic intercepts occurring over ROBERT THOMPSON'S cellular device.**

(emphasis added).

Thompson contends that the above averment in the Master Affidavit "demonstrates that the Government had, on April 4, 2020, information unlawfully obtained from Thompson's cellular device and was using it to corroborate the credibility of its cooperating witness [CW#2]." Thus, he states that since the Order authorizing the interception of Thompson's cellular device was not issued until April 7, 2020, the evidence that he contends was obtained before the Order must be suppressed.

The court does not read the above averments on page 55 of the Master Affidavit as Thompson reads it. Rather, Yelland states that he interviewed CW#2 on April 4, 2020, about Brown. Yelland then states that "[t]o date," the information CW#2 has provided was shown to be accurate and was corroborated, in part, through wiretap interception on "Thompson Target Phone 1." The court finds that

the phase "to date" as used by Yelland, regarding the corroborating evidence to support CW#2's reliability, refers to the date of his Master Affidavit, i.e., May 29, 2020, and not the date Yelland interviewed CW#2.

In fact, as indicated, the evidence, including the full 101 pages of the Master Affidavit which Thompson possesses, shows that no communications were intercepted over "Thompson Target Phone 1" until April 8, 2020. (*See eg*., pages 50-92 of the Master Affidavit).

Thus, Thompson's motion to suppress the intercepted communications over "Thompson Target Phone 1" based on the typographical error in paragraph 21 on page 19 of the Master Affidavit will be denied. *See* United States v. Wallace, 2009 WL 3182903, *2 (M.D. Pa. 2009) (holding that where search warrant "contained a minor typographical error .... [that] could easily be rectified by a quick glance at the affidavit of probable cause....[,] "[t]he inadvertent [error] did not invalidate the warrant's particularity."); *see also* Doe v. Groody, 361 F.3d 232, 240 (3d Cir. 2004) ("Reliance on the affidavit [to resolve typographical errors] neither broadens nor shrinks the scope of the warrant, but merely rectifies a minor irregularity."); United States v. Jones, 994 F.2d 1051, 1055 (3d Cir. 1993) (holding that the "resolution of doubtful or marginal cases ... be largely determined by the preference ... accorded to warrants.") (citation omitted).

## IV.    CONCLUSION

For the aforementioned reasons, Defendant Thompson's suppression motion regarding wiretap evidence, **(Doc. 352)**, is **DENIED IN ITS ENTIRETY**. An appropriate Order follows.


*s/ Malachy E. Mannion*
**MALACHY E. MANNION**
**United States District Court**

**Dated: July 2, 2021**
**20-108-01**